UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


United States of America,                                   Case No. 3:24-cr-94

        Plaintiff,

   v.                                                                        MEMORANDUM OPINION
                                                           AND ORDER

Rudolph Franco, Jr.,

        Defendant.


## I.     INTRODUCTION

Defendant Rudolph Franco, Jr. seeks to suppress evidence seized during a search of two properties he owned. (Doc. No. 49). The government filed a brief in opposition to the motion, (Doc. No. 55), and Franco filed a brief in reply. (Doc. No. 63). For the reasons stated below, I deny Franco's motion.

## II.    BACKGROUND

Through his motion to suppress, Franco challenges the sufficiency of the search warrant affidavit submitted by Donald Widmer, a task force officer with the Drug Enforcement Administration, to United States Magistrate Judge Darrell A. Clay. (Doc. No. 49-1). Within this section, I recite the events preceding the issuance of the search warrants by Judge Clay based solely on the contents of the challenged affidavit.

On June 29, 2023, a United States Postal Inspector identified a priority mail parcel as potentially containing narcotics. (*Id.* at 10). The inspector obtained a search warrant from Judge

Clay to search the package. (*Id.*). The package contained over 531 grams of blue pills marked with an "M" and "30," and which were found to contain fentanyl. (*Id.*). Records showed the parcel was tracked by two Internet Protocol addresses associated with a cell phone number, which investigators subsequently learned to be used by Edmundo Ruiz. (*Id.* at 10-11). At the time, Ruiz was serving a term of supervised release following his 2011 conviction on federal drug conspiracy charges. (*Id.* at 12, n.1 (citing *United States v. Ruiz*, Case No. 3:08-cr-304-JJH-1 (N.D. Ohio))).[1]

On July 30, 2023, investigators conducting electronic surveillance of Ruiz's cell phone noticed several phone conversations between Ruiz and a cell phone number registered to a man named Richard Williams. (Doc. No. 49-1 at 12). A short time later, investigators observed Williams arrive at Ruiz's residence on Western Avenue in Toledo, Ohio, and speak briefly with Ruiz in the front yard of the property before leaving. (*Id.*). Williams returned a few hours later and again spoke to Ruiz in the front yard before removing a bag from the front passenger seat of his vehicle and taking it inside the residence. (*Id.* at 12-13). When Williams departed a few minutes later, he was no longer carrying the bag. (*Id.* at 13).

In August 2023, Ruiz contacted an individual working as a confidential source with the Ohio Bureau of Criminal Investigations. (*Id.* at 13). Ruiz told the source that he was looking for buyers for kilograms of cocaine. (*Id.*). The source subsequently "purchased a large quantity of cocaine" from Ruiz at his Western Avenue residence. (*Id.*).

On August 10, 2023, Williams returned to Ruiz's residence and pulled into the driveway. (*Id.*). Ruiz approached Williams's car carrying a black backpack, which he placed onto the front passenger seat. (*Id.*). Ruiz removed a white bag from the car, and Williams then left. (*Id.*).

---

[1] Ruiz's earlier case was assigned to my colleague United States District Judge James G. Carr. That case was reassigned to me after Ruiz was charged with violating the conditions of his supervised release.

A few days later, investigators observed a man named Jonathan Calzada Pereda carry a package out of Ruiz's residence and get into a vehicle. (*Id.* at 14). Pereda was stopped by officers while traveling southbound on I-75, and a search of the vehicle uncovered $25,000 wrapped in packaging similar to what investigators observed Pereda carrying when he left Ruiz's residence. (*Id.*). While Pereda denied knowing anything about the money, Widmer stated, based upon his training and experience, that the money was likely the proceeds of Ruiz's drug transactions. (*Id.*).

During this same time period, investigators also observed Franco coming and going from Ruiz's Western Avenue residence. (*Id.* at 15). Franco previously was charged and convicted in the same case in which Ruiz was convicted. (*Id.* at 15, n.2 (citing *United States v. Franco*, Case No. 3:08-cr-304-JGC-3 (N.D. Ohio))).

On September 2, 2023, Franco arrived at Ruiz's residence just after 6:00 a.m. (Doc. No. 49-1 at 16). Franco walked to the back of the residence as Ruiz exited the front door, carrying something under his arm. Franco and Ruiz remained behind the house for less than one minute before they walked back to the front yard and Franco got into his car and drove away. (*Id.*). Ruiz was no longer carrying anything under his arm, and investigators surmised Ruiz had given the item to Franco. (*Id.*).

Franco returned to the house ten days later, around 4:00 a.m. (*Id.* at 18). Ruiz met Franco at the front door and gave Franco a box, which Franco placed in his car before driving away. (*Id.*).

On September 23, 2023, Franco again arrived at Ruiz's residence, spending approximately thirty minutes there before departing. (*Id.*). Surveillance showed that Franco drove from his residence on Vinton Street in Toledo to Ruiz's Western Avenue residence before returning to Vinton Street. (*Id.* at 18-19).

3

Franco returned to Ruiz's residence just after 10:30 p.m. the following day. (*Id.* at 20). Ruiz handed Franco a bag, which Franco placed into his vehicle before driving away. (*Id.*). Franco drove to a convenience store and remained there for a few minutes before departing. (*Id.*).

On September 26, 2023, investigators observed Franco remove an object from his pants and place it in his truck, which was parked in the driveway of his residence. (*Id.*). A few minutes later, investigators saw Hector Alverado, Jr. arrive at Franco's residence. (*Id.*). Investigators previously observed Alverado at Ruiz's Western Avenue residence, and the confidential source reported that Ruiz and others provided Alverado with cocaine. (*Id.* at 14). Franco removed a rectangular-shaped object from his truck and placed it into the passenger side door of Alverado's truck. (*Id.* at 20). Alverado then drove away. (*Id.*).

Two days later, Pereda and a man named Arturo Camarillo Aviles entered Franco's residence. (*Id.*). When they left approximately one hour later, Aviles was carrying a black backpack, which he placed in the trunk of a vehicle before the two men drove away. (*Id.* at 20-21). Investigators surveilled the men as the drove to a hotel located on Hagman Road in Toledo. (*Id.* at 21). Pereda and Aviles removed two backpacks from the trunk of their vehicle and took them inside. (*Id.*). They left a few minutes later without the backpacks. (*Id.*). After reviewing surveillance video from inside the hotel, investigators came to believe that Pereda and Aviles left the backpacks with a man named Orval Babilonia Narvaez. (*Id.*).

The next day, investigators observed Franco carry a black bag from his residence to his vehicle and then drive to Ruiz's Western Avenue residence. (*Id.*). When he arrived, Ruiz removed the bag from Franco's vehicle and placed it on the ground. (*Id.*). Franco then drove away. (*Id.*).

On October 1, 2023, Franco and Alverado met Ruiz in the front yard of his residence before going inside. (*Id.* at 21-22). Alverado exited a few minutes later carrying a box, which he placed in the bed of his pickup truck before driving away. (*Id.* at 22). Franco followed shortly thereafter,

4

carrying what appeared to be the same black bag Ruiz had taken from Franco's car a few days earlier. (*Id.*). Investigators observed the bag appeared to be much lighter than it was when Franco delivered it to Ruiz. (*Id.*).

On October 5, 2023, Williams met Ruiz at his residence. (*Id.*). Ruiz removed a brown box from his truck and entered the passenger side of Williams's truck, which was parked in Ruiz's driveway. (*Id.*). Ruiz exited with the brown box a few minutes later and got back into his own truck as Williams left. (*Id.*). Franco arrived at Ruiz's residence a few minutes later. (*Id.*). Ruiz spoke with Franco for a short period before removing the brown box from his truck and placing it in the trunk of Franco's vehicle. (*Id.* at 22-23). Investigators believed it to be the same box Ruiz obtained from Williams. (*Id.* at 23).

Franco returned to his Vinton Street residence, where he carried the box inside. (*Id.*). Less than 15 minutes later, Franco exited the residence with a brown box consistent with that he received from Ruiz and placed it in the trunk of a vehicle occupied by Pereda and Aviles. (*Id.*). Pereda and Aviles drove to the Hagman Road hotel, where they removed a square-shaped black backpack from the trunk. (*Id.*). They again met with Babilonia Narvaez in a room he rented. Pereda and Aviles left the hotel approximately 45 minutes later. (*Id.*). Aviles was carrying the black backpack, but investigators noticed it was no longer square-shaped. (*Id.* at 23-24).

The next day, investigators observed Babilonia Narvaez exit the hotel and carry a maroon backpack and a black suitcase to a white car. (*Id.* at 24). Babilonia Narvaez drove the car northbound on I-75 into Michigan, where a state trooper observed Babilonia Narvaez commit a traffic violation a short time later. (*Id.*). Babilonia Narvaez consented to a search of the car, which resulted in the discovery of over $73,000 in cash, a money counter, and several bank deposit receipts. (*Id.* at 24-25).

5

On October 11, 2023, investigators observed Williams pull into the driveway of Ruiz's Western Avenue residence. (*Id.* at 25). Ruiz exited his truck, which was parked in the driveway, and got into Williams's vehicle before exiting approximately ten minutes later. (*Id.*). A short while later, Franco left his residence and drove to Ruiz's house, where he parked in the driveway and opened his trunk as Ruiz approached. (*Id.*). Ruiz appeared to take something out of his pocket and put it in the trunk before Franco closed it and drove back to his Vinton Street residence. (*Id.*).

That same month, investigators directed the confidential source to arrange to buy cocaine from Ruiz. (*Id.*). Investigators observed Franco leave his residence and drive to Ruiz's Western Avenue home. (*Id.*). Franco approached the front door carrying a plastic bag containing a white substance, which he handed to Ruiz before returning to Vinton Street. (*Id.* at 25-26). Not long after Franco left, the source purchased cocaine from Ruiz at his Western Avenue residence. (*Id.* at 26). The cocaine was in a plastic bag that appeared to be consistent with the one Franco gave to Ruiz. (*Id.*).

On November 26, 2023, investigators observed Franco place a black rectangular-shaped object inside a pickup truck before driving the truck to another house on Vinton Street. (*Id.* at 26-27). Franco was the owner of this house, which appeared to investigators to be unoccupied. (*Id.* at 9). Ruiz met Franco at the vacant Vinton Street property, and the two men walked toward another road and out of view. (*Id.* at 27). Ruiz returned to his vehicle first, which he drove back to his residence. (*Id.*). Franco returned a few minutes later carrying a black object, which he placed inside his truck. (*Id.*).

A short time later, Williams arrived at Ruiz's residence. (*Id.*). Ruiz left his house and got into Williams's truck. (*Id.*). Approximately two minutes later, Ruiz got out of the truck and returned to his residence. (*Id.*). Ruiz later returned to the vacant Vinton Street property, where Franco was still parked in his truck. (*Id.*). Ruiz and Franco drove separately back to Ruiz's house, where Ruiz

6

parked and got into Franco's truck. (*Id.*). Roughly a half hour later, Williams returned to the property. (*Id.* at 27-28). Ruiz exited Franco's truck and appeared to remove something from his vehicle in the driveway before getting into Williams's truck. (*Id.*). Ruiz exited the truck a minute later, and Williams drove away. (*Id.* at 28).

On December 4, 2023, DEA agents in Cincinnati, Ohio observed Aviles receive a cardboard box and a backpack from an unknown person. (*Id.* at 29). Aviles then placed the items in the trunk of his vehicle. (*Id.*). The following day, the agents coordinated a traffic stop of Aviles's vehicle. (*Id.*). They searched the vehicle and found a total of 30 kilograms of cocaine in the box and backpack. (*Id.*). The investigation subsequently revealed that the cocaine was being transported to Franco at his Vinton Street residence. (*Id.*).

The investigation continued during the ensuing months, with surveillance efforts revealing that Franco continued to frequent the vacant Vinton Street property. (*See id.* at 29-30, 33). On January 24, 2024, an undercover DEA agent conducted a controlled purchase of 100 fentanyl pills from a man named Sherman Golden, who also resided on Vinton Street. (*Id.* at 31). After telling the undercover agent he needed to get the pills from down the street, Golden walked over to Ruiz, who was sitting in his parked truck on Vinton Street. (*Id.*). The two men drove to a property on Eastern Avenue in Toledo that Ruiz owned before returning to the buy location. (*Id.*). Golden got into the undercover agent's vehicle and sold him 100 blue fentanyl pills for $850. (*Id.* at 31-32).

While in the vehicle, Golden told the undercover agent that his uncle typically had the pills, but that the pills had been moved from their usual location.[2] (*Id.* at 31). Widmer noted that investigators knew that Franco is Golden's uncle. (*Id.*). Golden told the undercover agent that Franco owned both Franco's residence and the vacant Vinton Street property and maintained

---

[2] The undercover agent recorded his conversation with Golden. (Doc. No. 49-1 at 31).

7

cameras inside both locations. (*Id.*). Golden also detailed how he and Franco counted and packaged the fentanyl pills. (*Id.*).

Roughly two weeks later, the undercover agent again conducted a controlled buy, this time purchasing 200 fentanyl pills from Golden for $1,700. (*Id.* at 32). Golden told the agent he had keys to the location where the pills were stashed and discussed selling fentanyl powder and cocaine in the future. (*Id.*). The next day, Golden spoke by phone with Franco before sending the undercover agent a text message saying a sample was being delivered. (*Id.* at 33). Investigators then watched Franco walk from the vacant Vinton Street property to his Vinton Street residence before walking back a few minutes later. (*Id.*). Approximately an hour later, Ruiz and Golden arrived at and entered Franco's Vinton Street residence. (*Id.* at 33-34). Golden then told the undercover agent he was ready to complete the buy. (*Id.* at 34).

When the agent arrived, Golden entered the front passenger side of the vehicle and gave the agent a plastic bag containing a white substance in exchange for $250. (*Id.*). Golden told the undercover agent that he would deliver the rest of the product when the agent paid for it. (*Id.*). While they were in the car, the agent asked Golden about Franco and Ruiz, who were standing in the side yard of Franco's Vinton Street residence. (*Id.*). Golden identified Franco as his uncle and Ruiz as his cousin. (*Id.*). When Golden exited the vehicle, he walked over to Franco and Ruiz and spoke with them for over an hour in front of Franco's residence. (*Id.*).

On February 13, 2024, investigators observed Franco and Golden walk from Franco's Vinton Street residence to the vacant Vinton Street property. (*Id.*). Golden was carrying a large white box or bag. (*Id.*). The two men entered a detached garage at the vacant property. (*Id.*). Ruiz joined them in the garage approximately an hour later and stayed for around a half of an hour. (*Id.* at 34-35). Franco remained at the property for approximately 90 minutes before departing. (*Id.*).

A week later, Franco met a man named David Ruiz outside of his Vinton Street residence before the two men walked to the detached garage at the vacant Vinton Street property. (*Id.* at 36). Franco and David Ruiz were inside for less than one minute before they walked back to Franco's residence. (*Id.*). David Ruiz then left and returned to his residence on Western Avenue in Toledo. (*Id.* at 36-37). Investigators had observed David Ruiz conducting what appeared to be hand to hand drug transactions in front of his residence during the course of their investigation. (*Id.* at 37).

Later that day, the undercover agent contacted Golden to arrange a controlled purchase of fentanyl powder. (*Id.*). Around this same time, investigators observed Franco walk a dog from his residence to the detached garage of the vacant Vinton Street property. (*Id.*). Franco remained in the garage for a few minutes before leaving without the dog and walking back to his residence, carrying a white bag. (*Id.*).

On February 21, 2024, the agent arranged to purchase $10,000 worth of fentanyl powder from Golden. (*Id.*). After exchanging text messages with the undercover agent, Golden met with Franco in Franco's semi-truck, which was parked on a nearby street. (*Id.* at 38). Golden then exited the truck and walked to his residence, while Franco walked to his own. (*Id.*). Franco subsequently left his residence and went to the vacant Vinton Street property, where he retrieved his dog. (*Id.*). Franco left the dog in the backyard of his residence before walking to Golden's residence. (*Id.*).

A few minutes later, Golden left his house and got into the agent's vehicle, where he gave the agent approximately six ounces of a white substance in exchange for approximately $10,000. (*Id.* at 38-39). When Golden exited the agent's vehicle, he again met with Franco for a short time before driving to meet Edmundo Ruiz. (*Id.*). Golden and Ruiz spoke for a few minutes before departing. (*Id.*).

On February 22, 2024, Widmer submitted his search warrant affidavit and applications for the search of four properties, including Franco's Vinton Street residence and Franco's vacant Vinton

9

Street property; Judge Clay signed the warrants on the same day. (*Id.* at 41; *see also* Doc. Nos. 49-2 and 49-3). Franco was then charged by a criminal complaint with drug and weapons offenses and arrested the following day. (*See* Doc. No. 1). He later was charged by indictment with conspiracy to distribute and possess with intent to distribute controlled substances and unlawful possession of a firearm. (Doc. No. 11). Franco now moves to suppress evidence obtained pursuant to the February 22, 2024 search warrants for his Vinton Street Properties. (Doc. No. 49).

### III.    ANALYSIS

The Fourth Amendment generally requires law enforcement officers to obtain a warrant, based upon probable cause, before searching a location in which an individual has a reasonable expectation of privacy. *See, e.g., Carpenter v. United States*, 585 U.S. 296, 304 (2018) ("When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.") (further citation omitted).

Probable cause is the "reasonable grounds for belief" that evidence of a crime will be found in a certain place or location. *United Stated v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The probable cause inquiry does not require "an 'actual showing' of criminal activity at the targeted location, . . . instead ask[ing] whether officers provided direct or circumstantial support to create 'more than mere suspicion' that contraband will be found at the location in question." *United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024) (en banc) (quoting

10

*United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (further citation omitted), and *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (further citation omitted)).

The principles underlying a court's probable cause review are familiar. The Fourth Amendment requires only that "the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236 (citation omitted) (alteration in original). An affidavit "should be reviewed in a commonsense – rather than a hypertechnical – manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004). A magistrate judge's probable-cause determination is entitled to "great deference." *Sanders*, 106 F.4th at 461 (quoting *Christian*, 925 F.3d at 311-12 (further citation and quotation marks omitted)).

Franco argues the search warrant affidavit fails to establish probable cause for a search because it does not create a nexus between the alleged drug trafficking conspiracy and his two Vinton Street properties. (Doc. No. 49 at 7).

An affidavit may be said to create a nexus adequate to support the issuance of a search warrant when it "sufficiently show[s] that the 'specific "things"' to be searched for' (here, evidence of drug trafficking) are 'located on the property to which entry is sought' . . . ." *Sanders*, 106 F.4th at 460-61 (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) (cleaned up) and *United States v. Carpenter*, 360 F.3d 591, 594-95 (6th Cir. 2004) (en banc) (recognizing the nexus requirement)) (alteration added).

While the nexus analysis has a "fact-intensive nature," circumstantial evidence can be sufficient to establish that there is a fair probability the place to be searched contains evidence of a crime. *Sanders*, 106 F.4th at 461-62. Those circumstance may arise when an individual accessed a property immediately before or after a drug transaction, or where investigators can connect narcotics

11

to a specific property. *See United States v. White*, 990 F.3d 488 (6th Cir. 2021); *United States v. Miggins*, 302 F.3d 384 (6th Cir. 2002).

In *White*, the United States Court of Appeals for the Sixth Circuit held there was a sufficient nexus to search a property after a suspect twice entered a property immediately prior to engaging in a controlled purchase of cocaine. *White*, 990 F.3d at 490-93. In *Miggins*, the Sixth Circuit concluded there was sufficient evidence to support the issuance of a search warrant for a co-defendant's apartment where the search warrant affidavit stated that a defendant previously had been convicted of a narcotics-related offense and that a package containing a kilogram of cocaine was delivered to the apartment the two defendants shared. *Miggins*, 302 F.3d at 393-94 (citing cases).

Both circumstances exist here. On December 4, 2023, investigators intercepted a package containing 30 kilograms of cocaine that was destined for Franco's Vinton Street residence. (Doc. No. 49-1 at 29). Then, in February 2024, investigators directly connected Franco and his two Vinton Street properties to two controlled purchases between Golden and the undercover agent. (*Id.* at 32-34, 36-39). Moreover, these incidents occurred within a months-long drug-trafficking investigation into Ruiz and Franco, who previously have been convicted as co-conspirators for trafficking in illegal narcotics. Franco fails to show there was not a sufficient nexus between his properties and the illegal sale of narcotics.

### IV. CONCLUSION

I conclude Franco has not met his burden to show there was not probable cause to search his properties. Therefore, and for the reasons set forth above, I deny his motion to suppress. (Doc. No. 49).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge